# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MARY RICHCREEK,

                    Plaintiff,

-vs-                                                    Case No.  6:04-cv-1682-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Mary Richcreek, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration.  Doc. No. 11.  This matter has been referred to me for disposition

pursuant to 28 U.S.C. § 636(c).

## I.       PROCEDURAL HISTORY.

In April 2002, Richcreek filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401, *et seq*., alleging a disability onset date of December 2, 2000.  TR. 47-

49.  Richcreek's claim was denied, initially and upon reconsideration.

Richcreek requested a hearing before an administrative law judge (ALJ), which was held on March 5, 2004.  Richcreek, who was represented by an attorney, testified at the hearing. TR. 355-82.

After considering the testimony and the medical evidence presented, the ALJ found that Richcreek had not engaged in substantial gainful activity since the alleged onset date of her disability.  TR. 12.  The ALJ concluded that the medical evidence indicated that Richcreek suffered from degenerative disc disease of the lumbar area of the spine after laminectomy[1] and fusion, degenerative disc disease of the cervical area of the spine, fibromyalgia,[2] and temporomandibular joint (TMJ) disorder.[3]  TR. 13.  The ALJ determined that Richcreek's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  TR. 13-14.

---

[1] A surgical procedure removing the shingle-like portions of a vertebra (one of the segments of the spinal column) to relieve pressure on the spinal cord and nerve roots.  *See* NORTH AMERICAN SPINE SOCIETY, http://www.spine.org/fsp/glossary.cfm (last visited March 27, 2006).

[2] "A syndrome characterized by chronic pain, stiffness, and tenderness of muscles, tendons, and joints without detectable inflammation.  Fibromyalgia does not cause body damage or deformity.  However, undue fatigue plagues the large majority of patients with fibromyalgia and sleep disorders are common in fibromyalgia."  MEDICINENET.COM, http://www.medterms.com/script/main/art.asp?articlekey=3453 (last visited March 27, 2006).

[3] The temporomandibular joints (TMJs) connect the lower jaw to the skull.  There are two matching joints – one on each side of the head, located just in front of the ears.  The abbreviation "TMJ" literally refers to the joint but is often used to refer to any disorders or symptoms of this region.  Such symptoms include popping sounds in the jaw, inability to open the mouth fully, jaw pain, headaches, earaches, toothaches, and various other types of facial pain.  *See* MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/001227.htm (last visited March 27, 2006).

The ALJ found that Richcreek had the residual functional capacity (RFC) "to lift up to 20 pounds occasionally, lift and carry up to ten pounds frequently, and stand, walk or stand for up to six hours a day each with normal breaks as required in the course of an ordinary eight-hour workday."  TR. 15.[4]  The ALJ further found that Richcreek had "additional nonexertional limitations in that she must avoid frequent bending, crouching, and stooping."  *Id*.  The ALJ concluded that Richcreek's allegations concerning her limitations were not totally credible.  TR. 16.

The ALJ determined that Richcreek was unable to return to her past relevant work.  *Id*. The ALJ further found that Richcreek's capacity for light work was substantially intact and had not been compromised by any nonexertional limitations.  TR. 17.  The ALJ relied exclusively on the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2 (the "grids"), to determine that jobs existed in significant numbers in the national economy that Richcreek was able to perform.  TR. 16-17.   Accordingly, he concluded that Richcreek was not disabled.  TR. 16.

Richcreek requested review of the ALJ's decision by the Appeals Council.  TR. 7.  She presented additional medical records to support her request for review that she had not submitted to the ALJ.  TR. 345-54.  The Appeals Council considered this new evidence.  TR. 4.  On

---

[4] This is consistent with light work, which is defined by the regulations as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  The regulations further provide that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  *Id*.

September 17, 2004, the Appeals Council denied Richcreek's request for review. TR. 4-6. This appeal timely followed. Doc. No. 1.

## II. JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied Richcreek's request for review. *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981. This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

## III. STATEMENT OF FACTS.

A. *Richcreek's Testimony*.

Richcreek was born on August 1, 1961. TR. 361. She completed the ninth grade and never obtained any vocational training or a GED. TR. 361-62. At the time of her hearing, Richcreek lived with her husband and her two youngest children. TR. 360.

Richcreek's past work history included work as a warehouse packager/housekeeper, office cleaner, department manager, and manager for a dry cleaner. TR. 66, 362-33. Richcreek's most recent employment was at a warehouse where she was required to clean and set up apartments for corporate clients. TR. 362. Richcreek explained that this position entailed a great deal of bending and required her to lift between fifty and seventy-five pounds on occasion. TR. 364.

Richcreek testified that she was unable to do any bending or lifting and that she had difficulty "being on [her] feet for a long day." TR. 364-65. She had pain in her legs, mainly her right leg, which she described as a "numb ache." TR. 367. She testified that she lost her balance and sensation in her leg on occasion. *Id*. Walking exacerbated the pain. TR. 377.

-4-

She also suffered from "bad headaches" and problems with her neck and jaw.  TR. 370-71. Specifically, Richcreek explained that if she turned her neck too far in either direction, "it kind of like shocks."  TR. 370.  Richcreek reported that her jaw popped in and out of place, especially while she was eating.  TR. 371.

She also had fibromyalgia, which caused her to hurt all over.  When she awoke from sleep, her arms hurt.  TR. 368.

Richcreek testified that she had been suffering from depression since October 2003.  TR. 369.  She felt useless and worthless for not being able to help contribute to her family.  TR. 376. She had problems with her memory and concentration, TR. 376, and she had no energy, TR. 377.

Richcreek reported that the medications she was taking, Soma, Vicodin, Effexor, and Xanax, made her sleepy.  She was unable to drive a vehicle after taking these medications.  TR. 371.

Richcreek estimated that she could sit for approximately thirty minutes without having to alternate her position or stand.  She could stand for about thirty to forty-five minutes without having to alternate her position or sit down.  She was able to walk for thirty to forty-five minutes. TR. 373.  Richcreek explained that if she walked or stood for thirty to forty-five minutes or longer, her legs would get very weak.  TR. 374.  She was in the pool every day in the summer doing exercises.  TR. 375.

Richcreek testified that Dr. Goll placed her on sedentary work restrictions in the past and that as of August 2003 she was not permitted to work at all.  *Id*.  Richcreek explained that the

sedentary work restrictions consisted of no lifting over thirty pounds, no repetitive bending, and no repetitive anything with her legs or arms.  TR. 368.

Richcreek was able to perform some household chores, such as dusting and laundry, with the assistance of her daughter.  TR. 373.  She was able to cook simple meals.  *Id*.  Her daughter and husband accompanied her to the grocery store "to do all the bending and putting stuff in the basket."  TR. 378.  She attended church.  TR. 378.

Richcreek was able to take care of her own personal hygiene. TR. 373.  She had problems sleeping and she had to change positions three to four times a night due to pain.  TR. 371.  She usually slept for about five to six hours a night and she took a nap every afternoon for about an hour.  TR. 377.

     B.    *Medical Evidence*.

        1.    <u>Evidence Presented to the ALJ</u>.[5]

Richcreek sought treatment at Orlando Health Care Group (OHCG) for back pain and other ailments on several occasions from August 1996 to April 1998.  TR. 88-143.  On July 20, 1996, Richcreek presented to OHCG with complaints of back pain, among other things  TR. 125.  In June 1997, Richcreek was treated by William T. Sheahan, M.D., for lower back pain and radicular symptoms.  TR. 105, 102.  On July 8, 1997, Richcreek presented to OHCG with complaints of back pain and lower right leg pain.  She was assessed with back pain and sciatica.[6]  TR. 100.

---

[5]  Because Richcreek does not argue that the ALJ improperly considered her mental impairments, I will not review the evidence of such impairments unless otherwise relevant.

[6]  "Pain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction (hence the term), but now known to usually be due to

Beginning at least by July 1998, and continuing through February 2004, Richcreek was treated by Thomas J. Federico, M.D. TR. 291-337. The treatment notes from 1998 reflect that Richcreek complained of back pain and discomfort in her neck and shoulders; stiffness, soreness and swelling in her fingers; and pain radiating up her arm. TR. 330, 334, 337. A nerve conduction study performed in February 1999, was normal. TR. 325-36.

On July 26, 2000, Richcreek complained of pain in her lower back area. TR. 319. Upon examination, Dr. Frederico observed focal pain in her hip and sciatic region. He prescribed Soma, Voltaren, and Darvocet. *Id*.

On August 8, 2000, Dr. Federico placed Richcreek on the following work-related restrictions: (1) no lifting or carrying over five to ten pounds; and (2) no repetitive bending, squatting, or pushing/pulling. TR. 317-18.

Richcreek sought treatment at Orlando Orthopedic Center (OOC) for back pain and related symptoms from August 2000 to September 2003. TR. 147-76, 287-90. Her primary treating physician was Stephen R. Goll, M.D. TR. 176.

On August 23, 2000, Richcreek presented to OOC with complaints of lower back pain and bilateral leg pain with numbness and tingling. *Id*. Richcreek noted that her symptoms worsened with sitting, standing, walking, and bending forward and backward. Her walking tolerance was one half to one block. Her tolerance for sitting and/or standing was less than fifteen minutes. TR. 175-76.

---

herniated lumbar disk compromising the L5 or S1 root." STEDMAN'S MEDICAL DICTIONARY 1580 (26th ed. 1995) (STEDMAN'S).

-7-

Dr. Goll (SRG) observed that Richcreek ambulated with an antalgic gait, favoring her right lower extremity.  TR. 174.  She had decreased range of motion (ROM) in her lumbar spine, and pain in the right sacroiliac (SI) joint.[7]  A straight-leg raising test [8] was negative bilaterally.  Her patellar and Achilles/ankle jerk reflexes were diminished.  TR. 173.  Dr. Goll diagnosed lumbar strain.  He prescribed Celebrex, Soma, and physical therapy.  He placed Richcreek on "light duty restrictions," which consisted of the following:

> [N]o lifting greater than 10 pounds, may stand and walk 4-6 hours per day, may sit 1-3 hours per day, drive a standard or automatic transmission 1-3 hours.  May use upper extremities for grasping, fine manipulation, pushing or pulling.  May use lower extremities for operating foot controls.  May bend, twist, stoop, squat, climb and reach occasionally.  No sitting for greater than 45-60 minutes at a time without position change.

TR. 173.

An MRI of Richcreek's lumbar spine dated August 30, 2000, revealed a small central and slightly left-sided posterior protrusion of disc material at the L1-L2 level without spinal stenosis, a

---

[7]  Relating to the sacrum (the segment of the vertebral column forming part of the pelvis) and the ilium (the broad, flaring portion of the hip bone). STEDMAN'S at 850, 1565, 1566.

[8]  "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

mild annular bulging disc at L5-S1 without spinal stenosis, and probable multiple Schmorl's nodes.[9]  TR. 177.

On September 18, 2000, an MRI scan of Richcreek's lumbar spine showed disc dehydration degeneration at L5-S1 and left-sided disc lesion at L1-2.  TR. 172.  The impression of the attending physician was degenerative disc disease at L5-S1 and lumbar strain.  Richcreek was placed on sedentary work restrictions and a series of lumbar epidural steroids were recommended, as well as continued use of Celebrex and Soma.  *Id.*

On October 6, 2000, Richcreek was examined by James S. Lawrence, Jr. M.D.  TR. 181-83.  Richcreek complained of pain in her lower back which radiated to her right lower extremity extending to her toes.  Richcreek reported occasional tingling in her right leg and noted that she felt "her right leg may be weak at the same time it is numb."  TR. 181.  She indicated that her symptoms were aggravated by walking greater than one to one and one-half hours and sitting for longer than thirty minutes.  Dr. Lawrence observed that Richcreek walked with an antalgic gait.  She had slight tenderness to palpation over her lower lumbar spine and pain to palpation of the SI area, right greater than left, and over the right sciatic[10] notch.  TR. 181.  Dr. Lawrence's impression

---

[9] A Schmorl's node is "[a]n upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae (the bony building blocks of the spine).  Schmorl's nodes are detectable with an x-ray test as a spine abnormality." MEDICINENET.COM, http://www.medterms.com/script/main/art.asp?articlekey=14007 (last visited March 27, 2006).

[10] Relating to or situated in the neighborhood of the ischium (the lower and posterior part of the hip bone) or hip. STEDMAN'S at 895, 1580.

was lumbar degenerative disc disease with right lumbar radiculopathy[11] symptoms.  TR. 182.  He

administered lumbar epidural steroid injections.  TR. 178-80, 182. The epidural injections did not

provide Richcreek with any significant relief from her symptoms.  TR. 195.

On October 30, 2000, Richcreek was again examined at OCC.  She exhibited pain on

palpation of her lumbar spine at the lumbosacral junction upon examination.  Richcreek also

experienced pain with flexion and extension of the lumbar spine.  A sitting root test reproduced

buttock and leg pain.[12]  TR. 171.  Her Celebrex prescription was renewed.  TR. 171, 178-83.

Treatment notes for OOC dated November 2000 reflect that Richcreek's symptoms had

persisted for greater that four months without response to appropriate nonsurgical interventions.

Dr. Goll's diagnosis was degenerative disc disease L5-S1with discogenic pain syndrome L5-S1.

He continued Richcreek on sedentary work restrictions.  TR. 170.  In December 2000, Richcreek

underwent a three level lumbar discogram[13] injection with radiologic supervision and

------

[11] "Disorder of the spinal nerve roots."  STEDMAN'S at 1484.

[12] "In this test, the patient is seated in a chair with the neck flexed.  The examiner extends
the knee on the affected side up to ninety degrees.  Low back pain and radiation of the pain
indicate the test is positive.  This test places abnormal tension on the Sciatic Nerve and patients
with true Sciatica will tend to arch backwards and complain of radicular pain."  SHAW
CHIROPRACTIC GROUP, http://www.shawchiropractic.com/attorneys/MORE_glossary.htm (last
visited March 27, 2006).

[13] "A . . . discogram, is an enhanced X-ray examination of the pads of cartilage
(intervertebral disks) that separate the bones in your spine (vertebrae).  During this procedure, dye
is injected into the center of one or more disks, which makes the disks more visible on X-ray film.
A dis[c]ogram is used to detect structural damage in a disk and to help determine whether a disk is
causing pain.  The test can show if a disk has begun to rupture or has tears in its outer shell.  By
injecting fluid into the disk, the doctor can determine if the disk is painful."  MAYOCLINIC.COM,
http://www.mayoclinic.com/health/diskogram/AN00710 (last visited March 27, 2005).

interpretation at L3-4, L4-5 and L5-S1.  Dr. Goll performed the procedure.  TR. 169.  The

discogram demonstrated single level concordant pain response with altered disc morphology

(form) at the L5-S1 level and a CT scan report demonstrated significant disc wall disruption with

annular tear at L5-S1 consistent with a clinical objective and subjective findings at the time of

discography.  TR. 168.  Richcreek was to continue with her sedentary work restrictions with the

explicit limitations of no lifting greater than ten pounds and no repetitive bending until she had

surgery.  TR. 167.  Surgery was delayed by Richcreek's workers' compensation carrier pending a

second opinion.  TR. 166.

       In January 2001, Richcreek exhibited pain over both sciatic notch and sacroiliac areas upon

examination.  ROM in her lumbar spine was limited.  A sitting root test was positive on the right

side.  TR. 166.  Because she had been terminated from her job, Dr. Goll placed her on off work

status.  TR. 165.  Dr. Goll's assessment remained the same when he examined Richcreek in

February.  TR. 163-65.

       In April 2001, Richcreek underwent an anterior lumbar interbody fusion with placement of

a fusion cage and bone graft.  Dr. Goll and Stephen Huber, M.D., performed the surgery.  TR. 162-

63, 190-201.  On May 10, 2001, Richcreek presented for a follow-up visit at OOC.  TR. 162.

Richcreek still had some right leg pain but her back pain was decreasing.  ROM in her lumbar

spine showed limited flexion and extension and a sitting root test was negative.  TR. 162.

       On July 5, 2001, Richcreek exhibited some tenderness over her lumbar spine upon

examination.  The attending physician allowed Richcreek to return to sedentary work with no

lifting more than ten pounds with no repetitive bending.  TR. 161.  Physical therapy for lumbar

strengthening, conditioning and ROM was recommended.  *Id*.

Richcreek underwent physical therapy sessions with Laura Turner, PT, in July and August

2001.  TR. 202-09.  The therapy sessions did not provide Richcreek with any significant relief

from her symptoms.  TR. 207.

Treatment notes from OOC dated October 2001 reflect that Richcreek was "[g]enerally . . .

doing well.  TR. 159.  She had some right leg discomfort from the knee on down of minimal

magnitude.  She also had some right-sided back discomfort.  Examination of Richcreek's lumbar

spine showed no tenderness or spasm on palpation.  The attending physician opined that Richcreek

had reached maximum medical improvement and that she had a 12% permanent partial

impairment rating for workers' compensation purposes.  She was placed on permanent work

restriction of no lifting greater than thirty pounds and no repetitive bending.  *Id*.  However, the

same report also contains a statement from the attending physician that "[w]ork capacity

evaluation at this time indicates [Richcreek] can work light medium capacity lifting no greater

than 30 pounds maximum and occasional bending, twisting, squatting, stooping and climbing."

TR. 158.

Treatment notes from OOC dated November 1, 2001, reflect that Richcreek had tenderness

over the lumbar area of her spine and limited flexion upon examination.  TR. 157.  She was to

continue with the "same permanent light duty restrictions as previously assigned."  *Id*.

In April 2002, Richcreek reported that she was experiencing some discomfort in her back

and down the right side of her leg.  Examination of her lumbar spine revealed some discomfort

with flexion and extension.  TR. 156.  On May 23, 2002, Dr. Goll noted that MRI films showed that Richcreek had a small disc bulge at L1-2 and a small far lateral left-sided protrusion at L2-3. He diagnosed persistent right lumbar radiculopathy.  TR. 155.

On July 12, 2002, a physician whose name is illegible reviewed Richcreek's records and prepared a physical RFC assessment at the request of the SSA.  TR. 210-17.  This physician opined that Richcreek could frequently lift ten pounds and occasionally lift twenty pounds.  She could stand or walk (with normal breaks) and sit about six hours in an eight-hour workday.  TR. 211.  Her ability to push and/or pull was unlimited.  Richcreek was only able to stoop and crouch occasionally.  TR. 212.

Shortly therafter, David Z. Kitay, M.D., also reviewed Richcreek's records and prepared a physical RFC assessment at the request of the SSA.  TR. 269-76.  Dr. Kitay opined that Richcreek could frequently lift ten pounds and occasionally lift twenty pounds.  She could stand or walk (with normal breaks) and sit about six hours in an eight-hour workday. Her ability to push and/or pull was unlimited, and she had no postural limitations.  TR. 270-71.

On September 5, 2002, Richcreek was treated by Brian D. Fuselier, D.D.S., for complaints of ear pain, temporomandibular (jaw) pain, headaches, and problems with her teeth.  TR. 239-40, 242-65.  Richcreek rated the pain as constant and "moderate-to-severe," and she explained that the pain escalated to severe on a daily basis.  Dr. Fuselier concluded that Richcreek had masticatory myalgia, masticatory muscle splinting, and an acute problem with a particular tooth.  TR. 267.  Dr.

Fuselier treated Richcreek with occlusal[14] splint therapy and pain medication.  TR. 282.  One of

Fuselier's colleagues, Michael Logan, M.D., extracted the tooth that had the acute problem.  TR.

267.

On October 8, 2002, Richcreek complained that she was suffering from neck pain, which

she described as unbearable.  TR. 238.  On November 18, 2002, Dr. Fuselier prescribed Soma and

Vicodin.  TR. 233.  On December 17, 2002, Richcreek reported that her headaches had improved

slightly and that her jaw pain was less severe.  TR. 228.  Nevertheless, Dr. Fuselier continued to

treat Richcreek with pain medication.  *See, e.g.,* TR. 223-24.

On January 15, 2003, Richcreek was treated by Gopal K. Basisht, M.D., a rheumatologist.

TR. 278-79.  Richcreek complained of pain in her joints for the previous year.  TR. 278.

Specifically, Richcreek complained that she had been experiencing pain in the joints of her knees,

elbows, wrists and ankles.  She reported occasional swelling of her knees and morning stiffness

that lasted for an hour.  Richcreek also reported that she had been having difficulty sleeping for the

past year.  Dr. Basisht noted that Richcreek had a history of irritable bowel syndrome with colicky

pain in her abdomen, migraine headaches, and TMJ.  TR. 278.  Upon examination, Dr. Basisht

observed that Richcreek had normal range of motion, and no evidence of active synovitis[15] of the

---

[14] "In dentistry, pertaining to the contacting surfaces of opposing occlusal units (teeth or occlusion rims), or the masticating surfaces of the posterior teeth." STEDMAN'S at 1236.

[15] "Inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." STEDMAN'S at 1746.

joints. TR. 279. Dr. Basisht's impression was polyarthralgia[16] and fibromyalgia. TR. 279. On

January 29, 2003, Dr. Basisht noted that Richcreek continued to have pain in her musculoskeletal

system and lower back. TR. 277. His diagnosis remained the same. *Id*.

On February 18, 2003, Dr. Fuselier noted the Richcreek continued to suffer from pain that

originated in the occipital[17] posterior neck region and flooded throughout her head and face

regions. He recommended pain medication. TR. 282.

On February 28, 2003, Richcreek presented to Dr. Federico with complaints of recurrent

abdominal pain and "pain all over from the neck and back area." TR. 310. Dr. Federico observed

that Richcreek's neck muscles, lower back, buttocks region, and the area behind her knees

exhibited tenderness to palpation, as well as trapezius area discomfort. *Id*.

On March 10, 2003, Richcreek was treated at OOC for neck pain in her posterior cervical

region that radiated up across the back of her head. TR. 153. Examination of her cervical spine

showed no spasm on palpation. There were areas of tenderness over the right and left paracervical

area. *Id*. She was assessed with cervical strain. The attending physician prescribed Vicodin and

Soma and recommended physical therapy. TR. 152.

On March 19, 2003, Donald L. Renfrew, M.D., interpreted an MRI of Richcreek's cervical

spine. TR. 283-84. Dr. Renfrew's conclusions were, among things: (1) C6-7 degenerative disc

bulging with associated mild spinal canal and foraminal narrowing; (2) C3-4 mild right foraminal

---

[16] "Pains in many joints; conventionally refers to more than four joints, without signs of inflammation in the symptomatic joints." SPONDYLITIS ASSOCIATION OF AMERICA, http://www.spondylitis.org/patient_resources/glossary.aspx (last visited March 27, 2006).

[17] The back of the head. STEDMAN'S at 1236.

narrowing from uncinate spurring; and (3) slight straightening of the normal cervical lordosis.  TR. 284.  He also interpreted a CT scan of Richcreek's lumbar spine.  He noted an L1-2 central disc protrusion with mild flattening of the left side of thecal sac.  TR. 286.

On March 26, 2003, Dr. Basisht noted that Richcreek continued to have painful movements of her spine but no evidence of active synovitis of the joints. TR. 303.

Treatment records from OOC dated April 2003, reflect that Richcreek experienced tenderness over the right and left paracervical area of her cervical spine.  Richcreek reported that she was only able to attend one physical therapy session as recommended because she was unable to afford the copayment.  TR. 152.  The attending physician noted that an MRI dated March 19, 2003, revealed disc bulging at C6-7, secondary to degeneration, and no nerve compression.  TR. 151.  Richcreek was prescribed Ultram, Soma, and Vicodin.  *Id.*

Richcreek broke her wrist in May 2003.  She continued to complain of wrist pain thereafter.  TR. 294.

In June 2003, Richcreek presented to OOC with complaints of lower back and left lower extremity and thigh pain and right arm pain. TR. 146-51.  Richcreek reported a sharp shooting pain which appeared to have arisen from a slip and fall accident that took place in April 2003.  TR. 151.  She complained that the pain worsened with most daily activities, including standing, walking, bending, and daily housework, and that it awakened her at night.  TR. 150.  Richcreek reported numbness and tingling in both of her lower extremities which ran the entire length of her leg to her toes.  Richcreek also reported weakness in her hips and knees.  She experienced pain upon palpation in certain areas of her lumbar spine.  TR. 148.  Richcreek was assessed with

-16-

lumbar strain with left lumbar radiculopathy and a right wrist contusion.  Her prescriptions for

Soma and Vicodin were refilled and physical therapy was recommended.  *Id.*

On July 17, 2003, Dr. Basisht noted that Richcreek had painful movements of her spine

and areas of trigger point tenderness.  TR. 302.

On July 21, 2003, Dr. Federico treated Richcreek for "chronic recurrent back pains and

problems."  TR. 313.  Richcreek reported that her pain had worsened as of late.  She also was not

sleeping well due to chronic problems and pain in her back.  Dr. Federico observed that

Richcreek's cervical area was "uncomfortable" upon examination and that her lower back

exhibited definite tenderness along the thoracic and lumbar spine.  Dr. Federico's impression was

cervical arthritis, stress reaction, and fibromyalgia flare-up.  *Id.*

On August 18, 2003, Richcreek presented to OOC with complaints of neck and upper back

pain which radiated upwards to the back of her head.  TR. 289-90.  She also complained of pain in

her right wrist.  Richcreek reported that she could not attend therapy because she was unable to

afford the copayment.  Upon examination, she had full range of motion but some tenderness in the

intrascapular area.  TR. 290.  She was diagnosed with cervicothoracic[18] strain, and right wrist pain.

TR. 289.

2.     Evidence Presented to the Appeals Council.

On June 3, 2004, Michael W. Hayt, M.D., interpreted an MRI of Richcreek's cervical

spine.  TR. 350-51.  Dr. Hayt observed the presence of a 2 mm right foraminal disc protrusion at

C4-5 with moderate resultant right foraminal stenosis and contact of the right C5 nerve root.  TR.

---

[18] Relating to the neck and thorax.  STEDMAN'S at 314.

350.  Dr. Hayt further observed the presence of a circumferential disc bulge at C5-6 that mildly indented the ventral spinal canal with moderate resultant right foraminal stenosis.  *Id*.  Dr. Hayt noted that these findings appeared progressed as compared with an MRI taken on March 19, 2003. TR. 351.

On June 4, 2004, Dr. Federico opined that the "last two MRI studies" showed severe and worsening cervical spine degeneration with some cervical disk intrusion and foraminal stenosis. TR. 349.  He opined that Richcreek was "currently disabled and UNABLE MEDICALLY to be employed at any position for which she is qualified."  *Id.*  (emphasis in original).

## IV.    STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards.  *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986).  While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision.  *Id*. at 1000.  Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence.  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The Court may not reweigh the evidence or substitute its own judgment for that of the SSA.  *Id*.  When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying,

or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits.  In sum, when evaluating a claim for benefits under OASDI an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment or combination of impairments severe?

(3) Does the claimant's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?[19]

20 C.F.R. § 404.1520(a)(4).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel*, 800 F.2d at 1030.

## V. ANALYSIS.

Richcreek raises three issues on appeal. First, Richcreek asserts that the ALJ erred by relying on the grids rather than calling a vocational expert to determine whether there were jobs available in the economy she could perform. Doc. No. 19 at 8. Next, Richcreek contends that the ALJ "erred by improperly evaluating the non-exertional impairment of pain where substantial evidence shows [she] suffered from a severe back condition requiring surgery and fibromyalgia both of which could reasonably be expected to cause the alleged pain." *Id*. at 12. Finally, Richcreek maintains the ALJ erred in finding that her allegations concerning the pain and limitations associated with her impairments were not totally credible. *Id*. at 14. I will address only the first issue, because I find it to be dispositive.

"Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the [Commissioner] to show other work the claimant can do. . . . Although this burden can sometimes be met through straightforward application of [the grids] . . . [e]xclusive reliance on the grids is appropriate in cases involving only exertional impairments . . . [and is] inappropriate when

---

[19] In an OASDI case, a claimant must also establish that she was disabled during the time that she was insured under the act. *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

a claimant has a nonexertional impairment that significantly limits the claimant's basic work activities." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (internal citations omitted).  As previously discussed, the ALJ determined that Richcreek had "nonexertional limitations in that she must avoid frequent bending, crouching, and stooping."  TR. 15.

"[W]hen both exertional and nonexertional limitations affect a claimant's ability to work, the ALJ should make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations." *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).  The ALJ made this finding, concluding that Richcreek had the ability to perform substantially all of the full range of light work.  TR.  17.  However, he offered no explanation of how he arrived at this conclusion. In this circuit, "[a]n ALJ's conclusion that a claimant's limitations do not significantly compromise his basic work skills or are not severe enough to preclude him from performing a wide range of [work at the designated level] is not supported by substantial evidence unless there is testimony from a vocational expert." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *see also Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1303 (M.D. Fla. 2002) ("Where non-exertional limitations are alleged, the preferred method of demonstrating the claimant can perform specific work is through the testimony of a vocational expert.").  Because the ALJ did not call upon a vocational expert to determine whether there was work Richcreek could have performed despite her exertional and nonexertional impairments, his conclusion that she could perform substantially all of the full range of light work is necessarily not supported by substantial evidence. Accordingly, remand is required.

On remand, the Commissioner should carefully consider the law addressing nonexertional impairments arising from fibromyalgia.  As courts have observed, there are no laboratory tests for fibromyalgia, and the principal symptoms are pain all-over, fatigue, disturbed sleep and stiffness, with multiple tender spots.  *See Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1250 (N.D. Ala. 2003) (citing *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996)); *see also  Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling.").

## VI.     CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings consistent with the foregoing analysis.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 28th day of March, 2006.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-22-